IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KENNETH WAYNE STODDARD

              Petitioner,

  -against-

SECRETARY, FLORIDA DEPARTMENT       Case # _____
OF CORRECTIONS,

              Respondent.

_____/

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254

COMES NOW the Petitioner, Kenneth Wayne Stoddard, by and through undersigned counsel, and hereby petitions this Court to vacate and set aside his conviction and sentence pursuant to 28 U.S.C. § 2254, because he is confined under a prison sentence which violates his Sixth Amendment right to the effective assistance of counsel and his Fifth and Fourteenth Amendments right to due process of law.

### JURISDICTION AND VENUE

1.  Petitioner seeks relief from a judgment in the Circuit Court for the Twelfth Judicial Circuit in Sarasota County, Florida entered against him on November 13, 2014, convicting him of Aggravated Manslaughter of a Child under the age of 18 by Culpable Negligence, in violation of Florida Statutes § 782.07(1) and (3), Aggravated Child Abuse, in violation of Florida Statutes § 827.03(1)(a)(1) and (2)(a), and Tampering with Evidence, in violation of Florida Statutes § 918.13, in Docket # 2012-CF-017088.

2.  Petitioner was sentenced to an aggregate sentence of 65 years imprisonment on November 13, 2014 by the Hon. Frederick P. Mercurio.

3.   Pursuant to the aforementioned judgment of conviction, Petitioner is currently in the custody of the Florida Department of Corrections at Holmes Correctional Institute, DC # S36501.

4.   This petition is brought pursuant to 28 U.S.C. § 2254, et seq. and challenges the validity of Petitioner's conviction, sentence, and continued incarceration.

5.   Petitioner was convicted and sentenced in the Circuit Court for the Twelfth Judicial Circuit in Sarasota County, Florida.  Thus, venue is proper in the United States District Court for the Middle District of Florida, Tampa Division.

6.  This petition is filed within 1 year of the date that Petitioner's conviction became final, absent tolling periods.

7.  No prior application for a writ of habeas corpus has been filed in this Court, or any other court of competent jurisdiction.

## PROCEDURAL HISTORY

8.   Petitioner was arrested on or about December 20, 2012 and ultimately charged on August 1, 2014 in a Second Amended Information with the aforementioned offenses.

9.  The case proceeded to trial on August 27, 2014, before a jury and the Hon. Frederick P. Mercurio.  At trial, Stoddard was represented by Eric J. Reisinger, Esq., who was appointed by the Court.

10.  On September 5, 2014, the jury convicted Stoddard on all counts. He was sentenced November 13, 2014, to sixty-five years in the custody of the Department of Corrections.  He remains incarcerated pursuant to the judgment of conviction.

11.  Following his conviction and sentence, Stoddard prosecuted a direct appeal to the Florida Second District Court of Appeals Docket # 2D14-5316.  On direct appeal, Stoddard raised three points of error: 1) he was denied due process where the trial court actively participated as a

litigator for the State and failed to question potential jurors after juror misconduct occurred during voir dire; 2) the trial court abused its discretion in permitting into evidence Google internet searches conducted by police that were more prejudicial than probative and thus denied Stoddard the right to a fair trial; and 3) Stoddard received ineffective assistance of counsel in violation of his rights under the Sixth Amendment to the U.S. Constitution and Art. 1, § 9 of the Florida Constitution where trial counsel failed to file a meritorious motion to suppress Stoddard's post-arrest statements to police after he invoked his right to remain silent and where trial counsel failed to effectively challenge biased jurors for cause, failed to preserve the trial court's denial of the challenge for cause and failed to effectively use preemptory challenges to eliminate bias jurors.

12. The Second District Court of Appeal per curiam affirmed without a written opinion on April 20, 2016, thereby ending Petitioner's direct appeals in the Florida state court system.

13. Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure on February 2, 2017 alleging three claims of ineffective assistance of counsel. The first claim alleged ineffectiveness based upon counsel's failure to file a motion to suppress statements. The second claim alleged counsel was ineffective during jury selection, and the third claim alleged ineffectiveness based upon counsel's failure to prepare the Defendant to testify.

14. On November 8, 2017, the trial court denied Claim # 2, and struck Claims # 1 and # 3 with permission to amend within sixty (60) days. On December 2, 2017, Petitioner filed a motion to reconsider Claim # 2, specifically arguing that he was not waiving or abandoning any claims, but was complying with the trial court's specific order. On January 5, 2018, Petitioner filed an Amended Rule 3.850 motion, again raising ineffective assistance of counsel due to counsel's

failure to move to suppress incriminating statements and failing to prepare Petitioner to testify in his own defense (Claims # 1 and # 3).

15.  On February 21, 2018, the trial court denied rehearing on Claim # 2 and directed the State Attorney to respond to Claims # 1 and # 3.

16.  The motion remained pending for more than 4 years until May 31, 2022, when the trial court summarily denied the motion in a written order.

17.  Petitioner timely again appealed the May 31, 2022 order to the Florida Second District Court of Appeal in Docket # 2D22-1787.  On December 2, 2022, the District Court of Appeal again per curiam affirmed without an opinion.

18.  This petition now follows.

## STATEMENT OF FACTS

The Underlying Incident and Arrest

19.  This case involved the death of Stoddard's autistic child M.S., who had recently moved from her mother's house to come live with her father, Petitioner and his wife, Misty Stoddard in late July of 2012.  On the night of December 12, 2012, M.S. was tied down to a plywood board, a helmet was over her head which was also attached to the board, and her mouth was covered with tape.  She suffocated and was later rushed to the hospital where she remained brain dead until she passed away on December 17, 2012.

20.  Five days prior to the incident, Stoddard had to rush home from work to take M.S. to the hospital after she cut her head open and received stitches.  Over the following days, M.S., would try to remove the stitches herself and that was the reason that she wore the helmet. Id. Stoddard was under the impression that M.S. had banged her head on a wall and caused the injury herself, and he wanted to protect his daughter. Id.

4

The night the incident occurred, Stoddard returned home from work and fed M.S. because Misty Stoddard was unwilling to feed her. It was Stoddard's night to have some relaxation time and he was watching his infant child while Misty Stoddard took care of the other children, including M.S. Later, he was alerted by Misty Stoddard screaming and he rushed to find her in M.S.'s room with M.S. laying unresponsive in her restraints. Stoddard removed the restraints, called 911 and performed CPR on M.S. until the paramedics arrived and took M.S. to the hospital.

21. While at the hospital, Petitioner was questioned by Police Officer Jeffrey Kokinda, who was accompanied by Child Protection Investigator Amanda Skillen and her partner. During this interrogation, Petitioner's sister was present. During this interrogation, Kokinda questioned Petitioner as to how his daughter had received the injuries. Petitioner replied that he did not know, and that he had obtained custody of his daughter because she was being sexually molested in her former home. During this interrogation, Misty Stoddard was present, was curled up in a fetal position, and was unresponsive to questions. A substantial amount of the questioning concerned Misty Stoddard's condition.

22. Kokinder later claimed at trial that Petitioner told him during this initial interrogation that Petitioner had used Velcro straps to restrain M.S.; this statement was not recorded even though Kokinder had an audio recording device with him. Petitioner denied making these particular statements.

23. Sarasota County Sheriff Detective Kim Northfield then conducted a second interview of Stoddard at the hospital on December 15, 2012, which was audio recorded. At one point during the recording, Stoddard invoked his right to remain silent and informed Detective Northfield that he did not want to speak anymore. In spite of this, the interview continued and Petitioner made a number of additional statements in response to questions from the detective.

24. Detective Northfield later conducted a third interview of Petitioner which was video recorded. Approximately halfway through the third interview, Petitioner again invoked his right to remain silent, but again the detective continued to interrogate him and elicited further statements.

25. Petitioner was later charged as indicated above, and Misty Stoddard was separately charged with First Degree Murder as principal in the death of M.S.

<u>The Trial</u>

26. Trial counsel did not make a pre-trial motion to suppress any of the statements made by Petitioner to law enforcement. Misty Stoddard was tried separately before Petitioner's case, and her trial and ultimately conviction for First Degree Murder garnered some media attention.

27. Petitioner's case proceeded to trial on August 27, 2014 after Misty Stoddard's verdict.

28. During jury selection, the trial court was made aware that Juror # 11, T.C., possibly had prior knowledge of the instant case because of his wife's occupation as a court reporter. During examination of this juror the following transpired:

> PROSPECTIVE JUROR 11: Good morning.
> THE COURT: [T.C.], I believe you indicated that you had some concern or you indicated you had some knowledge possibly about the case, and in addition, it's been brought to my attention that you are the significant other or spouse of [J.H.], who is a court reporter that frequently does court reporting services within the criminal justice system. First of all, do you have any knowledge of the case through your wife possibly doing any reporting on it?
> PROSPECTIVE JUROR 11: **I'm not sure if she did any depositions in that case but <u>her and I have discussed the case with possibly either from deposition work that she did or information that she might have gathered at the Public Defender's or State Attorney's Office.**</u>
> THE COURT: Now, do you participate in any way in her work? Do you do any type of transcription, editing, or anything of that nature?
> PROSPECTIVE JUROR 11: **About my only involvement is <u>proofreading some of her transcripts or depositions.</u>**

THE COURT: Do you have any specific recollection of proofreading any depositions in this particular case?

PROSPECTIVE JUROR 11: Not that I can remember, no.

THE COURT: Okay. Now, focusing on whatever information you may have about the case and what impact that may have aside from possibly speaking about the case

to your wife, with your wife, are you aware of any other information about the case from any other source?

PROSPECTIVE JUROR 11: Just the general media.

THE COURT: **Based upon what you have read in this case, have you formed any definite or fixed opinions as to the guilt or innocence of the defendant, Mr. Stoddard?**

PROSPECTIVE JUROR 11: **Not really. I mean, <u>maybe deep down inside I probably have</u>, but I want to hear all the facts. Just…**

…

MS. FRAIVILLIG: [T.C.], **I'm concerned about three little words that you used, "deep down inside." So do you think that you deep down inside may have decided how you should deliberate, if you're chosen?**

PROSPECTIVE JUROR 11: **No. What I meant was that, from what I heard through the media and other information, <u>the overall case would indicate that there was some wrongdoing someplace.</u>**

Juror # 12, R.D., also indicated that he had prior knowledge of the facts of the case from reading about the co-defendant, Misty Stoddard's, trial but ultimately indicated that he could set that aside. When the prospective jurors were asked their opinion on harsh punishment of children, Juror # 11 responded that he completely disagreed with the harsh punishment of children.

29.  The court then addressed another issue that arose with Juror # 9, D.C., when the trial court was made aware that it was the Juror's husband's birthday and the Juror's daughter had purchased cruise tickets as a surprise. After finding out the exact details, D.C. returned and the trial court questioned her regarding her ability to serve:

THE COURT: Okay. If you were forced to miss this, because we are scheduled to be in session on this Friday, if you were forced to miss this cruise based on the limited information we have at this point, would that cause you any concern about your ability to serve as a juror in this case and listen to the evidence from the witness stand, and in the form of exhibits and render a verdict according to the law and the evidence that you receive.
PROSPECTIVE JUROR 9: No.
THE COURT: It would not?
PROSPECTIVE JUROR 9: No.

30.   After that exchange took place, the rest of the panel returned to the courtroom and Juror # 12, R.D., expressed that he had another issue and would like to speak to the court privately. Trial counsel then went on to question the jurors about their ability to resist being swayed by others to which Juror # 11, T.C., responded before the entire panel, "**I wouldn't want to see another Casey Anthony case**."

31.   Later, trial counsel asked the prospective jurors if they could separate the issues in the case and be impartial, Juror # 12 indicated that this was the issue he had previously wanted to speak about privately.

PROSPECTIVE JUROR 12: We're talking about an issue of two different people here, and it's very closely related, and it's really difficult for me to separate one from the other.
THE COURT: What two people are you talking about, [R.D.]?
PROSPECTIVE JUROR 12: I'm talking about [M.S.] and Kenneth Stoddard.
THE COURT: You're talking about the victim, [M.S.], and the defendant, Mr. Stoddard?
PROSPECTIVE JUROR 12: Yes. In talking about those, it's really difficult for me to separate the one from the other, although basically that is what we're doing here. We're not -- there's nothing that can be done for [M.S.] at this point, nothing is going to bring her back. And we are trying to find some justice for Kenneth Stoddard, whatever that is. **And my personal concern is whether or not I can look at the evidence and forget about where she is at this point, and still be fair and impartial as far as what the evidence proves. It's not that I don't think I can do it. I can do it, although I think that it will be very emotional.**

32.  Both parties then had an opportunity to exercise challenges to any of the prospective jurors for cause. Trial counsel attempted to challenge Juror # 9, D.C., for cause, since she had a trip that was already paid for to which the trial court responded:

> THE COURT: I asked her if that would in any way interfere with her ability to serve and she said no without hesitation. So as for that reason, it would be denied. Anyone else, Mr. Reisinger?

33.  Trial counsel then challenged Juror # 12, R.D., for cause.  The State objected and the court again denied trial counsel's request.   The court reasoned that based on the totality of Juror # 12's responses, the trial court felt he could be fair and impartial.

34.  Both parties then exercised their peremptory challenges. After all peremptory challenges were exhausted, Jurors # 7, 11, 12, 18, 22, and 30 remained.  Trial counsel requested an additional peremptory challenge arguing that he was forced to use a peremptory challenge on Juror # 9, D.C., and she should have been stricken for cause since she had a vacation planned and the court had stricken all other jurors with vacation plans.  However, the trial court denied trial counsel's request reasoning that Juror # 9, D.C., indicated that she could still be fair and impartial despite the fact that she would be unable to go on vacation if she was chosen as a juror.

The Opening Statement

35.  During his opening statement to the jury, trial counsel promised the jurors that Stoddard would testify.  He told jurors they would hear Stoddard deny he ever put anything into his child's mouth and that when the child was tied down, it was for a short period of time to calm her down. Counsel stated that Stoddard would testify his only concern was protecting his daughter from hurting herself or others. Trial counsel laid out the "big picture" for the jury, repeatedly telling jurors that they would be learning all these details from Stoddard himself.  Following opening statements, the Court asked Stoddard whether he agreed with his lawyer telling the jury

that he would be testifying and if he agreed with counsel making those statements; because Stoddard understood that he would be testifying, he replied that he did agree.

The State's Evidence at Trial

36.  The State's first witness was **WILLIAM EDWARD GREEN**, paramedic for the Sarasota County Fire Department, who responded to the 911 call that was placed by Stoddard on December 12, 2012.  He testified regarding the various procedures that he performed on M.S. in attempt to save her life as well as the condition she was in on the night of the incident.  He also stated that he had trouble getting M.S.'s medical history from Stoddard, but Stoddard did inform the paramedics that M.S. was autistic, and told them multiple times they restrained her to protect her from hurting herself or others.

37.  Green further testified at the hospital Stoddard repeatedly went into the room when the door was closed and loitered around the door which he found strange.

38.  **SCOTT MCCOMAS**, another paramedic who was on the scene with Green, testified that the paramedics were told M.S. had been unresponsive for fifteen (15) minutes and that in his professional opinion, it appeared that M.S. had been in that condition for over thirty (30) minutes. He alleged that Stoddard was not responsive when asked why M.S. was not breathing, he just stated she was autistic,  that she self-mutilates, and they have to restrain her to protect her.

39.  **MICHAEL T. DE LEO**, deputy of the Sarasota Sheriff's Office, testified he also responded to the 911 call placed by Stoddard and arrived at the Stoddard residence after the paramedics.  He testified that when he inspected M.S.'s bedroom, he did not see any sheets, pillows, or blankets, and found pieces of duct tape that appeared to be in the shape of a glove along with a drill inside her room.

40.  On cross examination, De Leo testified he had not questioned anyone in the Stoddard residence as to why those objects were in M.S.'s room.

41.  **JEFFERY KOKINDA**, officer of the St. Petersburg Police Department, testified that he spoke with Stoddard at the hospital accompanied by Amanda Skillen and Officer Alvarez. (During that discussion, Stoddard stated that M.S. had mood swings, was violent, destructible, had a bad temper, and was recently removed from school because of her behavior.  He also testified that Stoddard informed them that he restrained M.S., and had her wear a helmet in order to protect her, and that he had purchased Velcro straps to restrain her because they would be safer for her. Officer Kokinda further testified that Stoddard used the word "hogtie" to describe how he restrained M.S.

42.  On cross-examination, Officer Kokinda admitted he had not recorded his interview with Stoddard.  When asked why he did not record the interview, he claimed that it was not standard practice.

43.  **MAXINE MILLER**, a crime scene technician for the Sarasota County Sheriff's Office, testified she went to All Children's Hospital to document the injuries sustained by M.S. She testified she took photographs as well as a video of M.S.'s injuries.

44.  **CRISTINA CUOCO**, of the Child Protection Investigation Division of the Pinellas County Sheriff's Office, testified she observed injuries on M.S.'s wrists, ankles, thighs, and arms while she was at the hospital and was also present during the interview of Stoddard that took place with Officer Kokinda and Amanda Skillen.  She also testified that Stoddard used the term "hog tie" during the interview.  After the interview, Cuoco alleged that Stoddard approached Misty Stoddard and said something to her quietly which concerned her.

11

45.   On cross-examination, trial counsel stated that he noticed Cuoco was reading something during her testimony.  After further questioning, it was revealed that Cuoco was reading Amanda Skillen's notes from the case.  She also admitted that she did not take any notes during the interview or record the interview.  Nor did she ask Stoddard what he had said to Misty Stoddard after the interview.  When asked why, Cuoco could not provide an answer.

46.   **JESSICA HENDRICKSON,** of the Sarasota County Sheriff's Office Forensics Unit, testified she responded to the Stoddard household to investigate the residence and collect evidence. Deputy Michael Day had alerted her to a wooden board that was located in a wooded area across the street from the Stoddard residence.  She collected the board, trace material that was found on the board, and various pieces and rolls of duct tape throughout the house as evidence.

46.   **KIM NORTHFIELD,** detective of the Sarasota County Sheriff's office testified she had interviewed Stoddard on multiple occasions.  During the first interview on December 13, 2012, Stoddard described how he was forced to restrain M.S. to protect her, he used duct tape to help restrain her, and painter's tape to prevent further injuries from the restraints.  She also searched the Stoddard residence and seized a laptop computer and a camera.  The camera contained three videos and three photographs of M.S. with injuries.  An audio recording of the second interview between Detective Northfield and Stoddard that occurred at the hospital on December 15, 2012 was then played for the jury.

47.   At one point during the recording, Stoddard invoked his right to remain silent and informed Detective Northfield that he did not want to speak anymore.  Trial counsel failed to object, and allowed the audio recording to continue to be played for the jury.

48. The State then informed the trial court that Stoddard invoked his right to remain silent about the halfway through the video recording of the third interview between Detective Northfield and Stoddard. The following transpired:

> THE COURT: In the statement that's going to be played?
>
> MS. O'DONNELL: In the statement that's going to be played and it's my understanding that Mr. Reisinger made a strategic decision to allow the rest of the statement to be played and I would just ask that you make sure that that's established on the record.
>
> THE COURT: **Well, there already was a statement to that effect in the past recording that was made and Mr. Stoddard clearly said that he didn't want to talk anymore and the police continued to talk with him. <u>There was no objection made to the redacted version</u>**. There was no contemporaneous objection made at the time the statement was played in front of the ladies and gentlemen of the jury, so I assume that that was some type of a strategic decision on the part of Mr. Stoddard and his lawyer. So I anticipation of another statement to that affect being brought out in front of the ladies and gentlemen of the jury in this next exhibit which will be exhibit number - -
>
> MS. FRAIVILLIG: 47.
>
> THE COURT: 47, **Mr. Reisinger, is it your position that for strategic purposes you're waiving any motions to suppress or otherwise exclude the recording of this next statement?**
>
> MR. REISINGER: Yes, Judge. **It was strategic, I believe, under the law. I don't think it rose to that level to be suppressed but I did not file a motion to suppress and I'm not objecting to it.**
>
> THE COURT: **And you discussed those issues with your client, Mr. Stoddard?**
>
> MR. REISINGER: **Yes, Judge.**
>
> THE COURT: **And Mr. Stoddard agreed to that strategy?**
>
> MR. REISINGER: **Yes, Judge.**
>
> THE COURT: Mr. Stoddard, you've been sitting here throughout the course of this discussion which we had outside the presence of the jury regarding these statements that you made. You can remain seated. I'm standing because I'm tired of sitting, quite frankly. You heard our discussions that have taken place outside the presence of the jury regarding the playing of these statements and **the fact that at least once in the prior statement that was played, you did indicate that you did not wish to continue to talk. Apparently, you also do that during the course of this next statement and you and your lawyer have decided not to raise any type of motions to suppress or keep out those statements. Is that accurate?**

THE DEFENDANT: **Not exactly, your Honor, no. I was under the understanding that he was going to file a motion to have those suppressed and when it wasn't confirmed that they were, I just assumed they were denied by you, sir.**
THE COURT: Okay. Well, for the record, there are no motions to suppress that have been filed in the court file and I have not been presented with any to rule on and since we already had one statement come in to which there was no spontaneous objection, and so it's not properly preserved at this point. And in light of Ms. O'Donnell's representation that there's another statement to that effect at this point and before we cause any problems, I think you and Mr. Reisinger need to speak about this issue.

49.   The trial court then ruled that after hearing the first recorded statement, it did not feel that the interview was a custodial interrogation and that Stoddard was read his Miranda rights prior to starting the second recorded interview with Detective Northfield.  Trial counsel and Stoddard then returned to the courtroom after speaking privately about the issue. Id. When asked by the trial court if he agreed with trial counsel's strategy of allowing the statements to come in without filing a motion to suppress, Stoddard replied, "[t]o the best of my non-attorney experience and skills, sir."  The video recording of the second recorded interview of Stoddard was then played for the jury.

50.   **MICHAEL DAY**, deputy of the Sarasota County Sheriff's Office, testified that he found a plywood board with holes in a wooded area near the Stoddard residence.  He stated that he found it inadvertently while walking in Stoddard's yard.

60.   The State then recalled **MAXINE MILLER** to the stand. She testified that she collected a buccal swab of Stoddard's DNA and M.S.'s DNA was collected via morgue personnel. Miller also testified regarding additional evidence that she seized from the Stoddard residence that was sent for DNA testing.

61.   **KEVIN DERMODY**, Stoddard's neighbor, testified he could hear abuse going on in the Stoddard residence from his own home. He alleged the sounds consisted of slapping and hitting

followed by screaming.  Dermody knew the sounds came from M.S. because he had met her before and it was M.S. being abused every time.  He also testified that it was always Misty Stoddard that he heard outside with M.S.  On cross-examination, Dermody stated that he never heard Stoddard when the abuse was taking place.

62.  **SUSAN HECK**, a nurse at Doctor's Hospital in Sarasota, Florida testified as to M.S.'s condition when she arrived at the hospital, the various treatments that were performed on M.S., and Stoddard's demeanor at the hospital.

63.  **MICHAEL GORN**, a Technician of the Forensics Services Unit for Sarasota County Sheriff's Office, testified he was tasked with examining a piece of duct tape in comparison to the helmet that M.S. was wearing the night of the incident. The results supported that the piece of tape that was recovered as evidence was affixed to the helmet.  Gorn also collected trace material found on M.S. that appeared to be adhesive.

64.  **J.E.**, Misty Stoddard's son, testified that Stoddard asked him for help with moving the plywood board that was used to restrain M.S. and that both of them carried it from the house into the woods. On cross-examination, trial counsel asked J.E. if Stoddard specifically asked him for help with moving the board and J.E. answered, "yes."  Trial counsel also asked if J.E. knew how long M.S. was usually restrained for and J.E. testified that he knew M.S. was usually restrained for the whole night because he would see her still on the board in the morning.

65.  Prior to the State calling their next witness, trial counsel renewed his objection as to the "Google" searches which was overruled by the Court.

66.  **DR. DIANA WRIGHT**, a forensic examiner for the FBI who specialized in tape, examined the various pieces and rolls of tape that were recovered from the Stoddard residence, as well as trace materials to determine if they were adhesives.  She testified that the trace adhesive

material that was found on the helmet M.S. wore came from a specific roll of duct tape that was seized as evidence, and the trace evidence that was collected from M.S.'s body was duct tape.

67. **PAUL SQUEO**, M.S.'s teacher at Oak Park School, testified that he handled M.S. in the classroom setting by using positive reinforcement and she responded well to that technique. Squeo admitted that M.S. was a difficult student when she started attending but stated that she had improved greatly. After M.S. was absent from school for a long period of time, Squeo had brought it to the attention of other school personnel at several meetings. Squeo testified he eventually filed a report with the Department of Children and Families (DCF) after those meetings failed to produce results and he learned that M.S. had received a self-inflicted head injury.

68. On cross-examination, Squeo stated that the school had a Crisis Intervention Team to assist teacher's with problem children. When trial counsel asked Squeo if he ever had to call the team to deal with M.S., he said he had done so several times.

69. **STEVEN HANILY**, a trace evidence analyst for the Florida Department of Law Enforcement, testified that he was tasked with testing trace evidence collected from the board, Velcro straps, the fibers on the helmet, and the painter's tape.

70. **MIRELLA LEE**, a teacher at Oak Park School, testified she was the team leader for the classes with students that were autistic. She further testified about meeting with Stoddard and Misty Stoddard to discuss issues they were having with M.S.'s teacher, Mr. Squeo, and how Squeo had brought to her attention that M.S. had been habitually absent from school.

71. **ALISHA STODDARD**, M.S.'s mother, testified that M.S. was sent to live with Stoddard on July 30, 2012. In order to maintain contact with M.S., Alisha Stoddard sent her an iPad and iPhone so that they could video chat with each other via Facetime, but they never had a

chance to communicate using either device. She also testified regarding M.S.'s behavioral issues and how she was able to deal with her prior to sending M.S. to live with her father.

72. **DR. RUSSELL VEGA** testified the toxicology report indicated that the medication that M.S. was prescribed to help treat her autism was not present in her blood. He also testified that in his opinion, M.S.'s death was caused by anoxic encephalopathy due to suffocation and that the manner of death was homicide.

73. **MEGAN ROMMEL**, a crime laboratory analyst from Florida Department of Law enforcement, testified she performed DNA analysis on evidence such as the board and multiple pieces of duct tape that were recovered from the Stoddard residence. She claimed she was able to positively match Stoddard's DNA to DNA that was on the board and was unable to rule out Stoddard as a contributor to DNA mixtures on some of the pieces of duct tape.

74. **DETECTIVE JOHN MCHENRY** testified that he performed a digital forensic examination of the computer. His analysis uncovered data for internet activity related to "Google" searches and he prepared a disk with the relevant data to be presented at trial. The disk was admitted into evidence over trial counsel's objection.

75. McHenry was able to identify Stoddard and Misty Stoddard as the users of the computer. The internet searches that McHenry discovered during the examination concerned the punishment of children, restraining children, how to keep children quiet, and various forms of gagging techniques. McHenry also provided examples of the results that would appear if a person were to enter those search terms on Google.

76. When McHenry testified regarding the search "What are fail proof punishments for toddlers," he read aloud to the jury the headers of the search results, one of which was "**A Criminal**

**Defendant's Choice to Go to Trial, Accept a Guilty.**"  Trial counsel failed to object to that testimony.

77.  On cross-examination, McHenry admitted that he was unable to determine who actually inputted the searches and that some of the images that he presented to the jury were not actually found on the computer.  He also admitted that the search results that were read to the jury were not the actual results at the time the searches were performed but the results that displayed when he entered the search terms on his personal computer during his investigation.

78.  The trial court then addressed an issue concerning the State's intention to introduce what was called the "target child" phenomenon through the testimony of Dr. Sally Smith.  After a lengthy discussion and a proffer of Dr. Smith's testimony, the trial court ruled that the testimony was inadmissible because it's probative value was substantially outweighed by the unfair prejudice to Stoddard.

79.  **DR. SALLY SMITH** then testified about her examination of M.S. at the hospital without any mention of the target child phenomenon.  The State rested at the conclusion of Dr. Smith's testimony.

The Defense Case at Trial

80.  After unsuccessfully moving for a judgment of acquittal, trial counsel called **JODY SMITH**, home school liason at Oak Park School, who testified that prior to M.S.'s death, she had went to the Stoddard residence to investigate M.S.'s truancy and attempted to help the Stoddard family by giving them referral information for agencies that could assist them with M.S.'s aggressive behavior.

81.  **SHAWNA RENNER**, Stoddard's sister, testified as to what she witnessed while at the hospital where M.S. was being treated.

82. **KELSIE MACMILLAN**, a physician's assistant in the emergency room at Sarasota Memorial Hospital, testified M.S. suffered laceration near her eyebrow on December 7, 2012. She testified that stitches were required to treat the injury and that she did not suspect that M.S. had suffered any abuse. At the conclusion of Macmillan's testimony, the defense rested.

Sentencing

83. Petitioner was ultimately sentenced as indicated above, and began the process of challenging his conviction and sentence as outlined in the Procedural History above.

84. Having exhausted all of his state court remedies, Petitioner now seeks relief in this Court pursuant to 28 U.S.C. § 2254.

## REASONS FOR THE WRIT TO ISSUE

### Standard of Review

85. "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C § 2254.

86. A state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. See Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000).

87. "A state court decision involves an unreasonable application of federal law when it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Ponticelli v. Sec'y, Fla. Dep't of Corr., 690 F.3d 1271, 1291 (11th Cir. 2012) (internal quotations and citations omitted). The "unreasonable application" inquiry requires the Court to conduct the two-step analysis set forth in Harrington v. Richter, 562 U.S. 86 (2011). First, the Court determines what arguments or theories support the state court decision; and second, the Court must determine whether "fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior" Supreme Court decision**.** Id. (citations omitted).

**CLAIM I – BECAUSE PETITIONER WAS NOT TRIED BEFORE AN IMPARTIAL, UNBIASED JURY, AND THE STATE COURT'S DECISION OTHERWISE WAS CONTRARY TO CLEARLY-ESTABLISHED FEDERAL CONSTITUTIONAL LAW AND AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE RECORD, THIS COURT SHOULD GRANT THE INSTANT HABEAS CORPUS PETITION**

88. The right to jury trial guaranteed by the Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. Irwin v. Dowd, 366 U.S. 717, 722 (1961); Knight v. Dugger, 863 F.2d 705, 718 (11th Cir. 1988). "The most general interpretation of a fair trial is that it be conducted before unprejudiced jurors." Farese v. United States, 428 F.2d 178-80 (5th Cir. 1970)).

89. A juror cannot be considered "impartial" or "indifferent" where she has predetermined the defendant's guilt before the conclusion of the trial proceedings. United States v. Heller, 785 F.2d 1524, 1526 (11th Cir. 1986); Gray v. Hutto, 648 F.2d 210, 211 (4th Cir. 1981); United States v. Cox, 324 F.3d 77, 86 (2d Cir.), cert. denied, 540 U.S. 854 (2003). Thus, where a juror "formed and expressed a premature conviction of guilt, we must conclude that the juror's comment,

indubitably improper, was presumptively prejudicial, with the burden resting upon the prosecution to establish that such communication ... was harmless to the defendant." <u>Gray</u>, 648 F.2d at 211.

90.    Moreover, in <u>Heller</u>, the Eleventh Circuit quoted with approval Justice Brennan's concurrence in <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548 (1983), wherein he stated that "the bias of a juror will rarely be admitted by the juror himself." <u>Heller</u>, 785 F.2d <u>at</u> 1527 n. 1. Indeed, in such situations, "[w]ith the manifestly strong pressures on the juror to exculpate herself from a quite untenable position, her self-serving statements [denying she had predetermined the defendant's guilt] should not count for much." <u>Gray</u>, 648 F.2d <u>at</u> 211.

91.    Here, the trial court was aware that Juror # 11 had made a comment during voir dire that indicated he was biased towards Stoddard. Specifically, Juror # 11 said, "I wouldn't want to see another Casey Anthony case."[1] The verdict in that case was highly controversial and that comment indicates that Juror # 11 already formed an opinion that Stoddard was guilty and he would not want to see another person who was responsible for the death of their own child be found not guilty.

92.    Even if the remark was intended as a joke does, it not alleviate the prejudicial effect on Stoddard's right to a fair trial by an impartial jury. <u>See</u> <u>Heller</u>, 785 F.2d <u>at</u> 127 (Even though the remarks may have been intended as humor, the individuals making them and those laughing at them displayed the sort of bigotry that clearly denied the defendant Heller the fair and impartial jury that the Constitution mandates).

---

[1] That comment was in reference to the high profile case in Florida where the defendant, Casey Anthony, was accused of being responsible for the death of her small child and was found not guilty. The acquittal generated significant negative backlash against Casey Anthony and the State Attorney who lost the case, which was also widely publicized in the media.

93.   Here the trial court did not make any inquiry into the misconduct in Stoddard's case. In fact, Juror # 11 was not asked another question for the remainder of voir dire and was allowed to serve as a member of the jury which convicted Stoddard on all counts.

94.   The reason that Juror # 11 was seated was because trial counsel was forced to exercise his last peremptory challenge on Juror # 9, who counsel argued should have been stricken for cause since she had a vacation planned and the court had stricken all other jurors with vacation plans. Trial counsel requested an additional peremptory challenge to exercise against Juror # 11, but the request was denied.   Both parties then exercised their peremptory challenges. After all peremptory challenges were exhausted, Jurors # 7, 11, 12, 18, 22, and 30 remained.   Trial counsel requested an additional peremptory challenge arguing that he was forced to use a peremptory challenge on Juror # 9.   However, the trial court denied trial counsel's request reasoning that Juror # 9, D.C., indicated that she could still be fair and impartial despite the fact that she would be unable to go on vacation if she was chosen as a juror.

95.   Simply put, that Juror # 11 denied his own predetermination of Stoddard's guilt prior to engaging in misconduct is an insufficient basis on which to conclude that Stoddard was tried before a fair and impartial jury, and the court erred in relying upon it.

96.   Because the Second District Court of Appeal has never rendered a written decision on Stoddard's two appeals before it, the only Constitutional analysis of Stoddard's claim comes from the trial court.   The record is clear that the trial court's determination of Juror # 11 and Juror # 12 was contrary to clearly-established Federal Constitutional law and Supreme Court precedent.

97.   The record is equally clear that the ruling was an unreasonable Federal law because it correctly identified the governing legal principals as enunciated by the Supreme Court, but unreasonably applied the rule to the Petitioner's case and also unreasonably declined to extend

these governing principles to the specific context of this case. Finally, the trial court's factual determination was unreasonable given Juror # 11's several issues – that the juror had some knowledge about the case due to a relationship with a court reporter who had performed some work on the case, the juror had several strong opinions regarding treatment of children, and apparently believing that Casey Anthony was guilty and got away with murder, was determined not to see it happen again.

98.    Finally, the post-conviction court decision was based on an unreasonable determination of the facts. The record clearly establishes that both jurors were not unbiased, impartial. The post-conviction court's factual determination to the contrary was based on a tortured version of the fact in light of the record and the clear statements of the jurors, and thus deserves no deference.

99.  Because Petitioner was not tried before an unbiased, impartial jury, this Court should grant the instant habeas petition in its entirety.

**CLAIM II – BECAUSE THE STATE COURT'S DETERMINATION THAT PETITIONER RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS WHERE HIS TRIAL ATTORNEY FAILED TO EFFECTIVELY CHALLENGE BIASED JURORS AND FAILED TO FILE A MOTION TO SUPPRESS WAS CONTRARY TO CLEARLY-ESTABLISHED FEDERAL CONSTITUTIONAL LAW AND WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED BY PETITIONER WITH HIS POST-CONVICTION RELIEF MOTION AND THE LACK OF EVIDENCE TO THE CONTRARY, HABEAS RELIEF IS WARRANTED**

100.  It is axiomatic that the United States Constitution guarantees each defendant in a criminal prosecution the right to the effective assistance of counsel. The fundamental right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has

on the ability of the accused to receive a due process of law in an adversarial system of justice. United States v. Cronic, 466 U.S. 648, 658 (1984).

101.  The United States Supreme Court has held that "[t]he benchmark of judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984).  Under the Strickland standard, ineffective assistance of counsel is made out when the defendant shows that (i) Counsel's performance was deficient, i.e., that he or she made errors so egregious that they failed to function as the "counsel guaranteed the defendant by the Sixth Amendment;" and (ii) the deficient performance prejudiced the defendant enough to deprive him of the due process of law.  Id. at 687.

102.  A court deciding a claim of ineffective assistance of counsel must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case."  Id. at 690.

103.  Under Strickland, a defendant must establish the following two components in order to demonstrate that counsel was ineffective: (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense.  Id. 466 U.S. at 686.

104.  Under the deficiency prong, the defendant must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.    To prove the prejudice prong, the defendant must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>Strickland</u>, 466 U.S. at 686.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome. <u>Id</u>. at 694.

105.   A court deciding a claim of ineffective assistance of counsel must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.    "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." <u>Strickland</u>, 466 U.S. at 690.  <u>Strickland</u> cautions courts to refrain from second-guessing counsel's strategic decisions from the superior vantage point of hindsight.  <u>Id</u>. at 689.  "Strategic choices made **after a thorough investigation of law and facts relevant to plausible options** are virtually unchallengeable."  <u>Id</u>. <u>at</u> 690-691 (emphasis added).

106.  At the same time, "virtually unchallengeable" does not mean wholly unchallengeable. <u>See</u> <u>Pavel v. Hollins</u>, 261 F.3d 210, 218 (2d Cir. 2001). As the Eleventh Circuit has held, "[c]ertain defense strategies, however, may be so 'ill-chosen' as to render counsel's overall representation constitutionally defective."  <u>Adams v. Balkcom</u>, 688 F.2d 734, 738 (11th Cir. 1982). The Eleventh Circuit has further held that "so called 'strategic' decisions that are based on a mistaken understanding of the law, or that are based on a misunderstanding of the facts are entitled to less deference." <u>Hardwick v. Crosby</u>, 320 F.3d 1127, 1186 (11th Cir. 2003) (citations omitted).

107.  Effective assistance of counsel requires that an attorney do more than simply stand next to a client in court as a potted plant.  The Supreme Court described the duty to provide effective assistance as follows:

> **The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing**.   When a true adversarial criminal trial has been conducted - even if defense counsel may have made demonstrable errors - the kind of testing envisioned by the Sixth Amendment has occurred.  But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.  As Judge Wyzanski has written:     "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, **neither is it a sacrifice of unarmed prisoners to gladiators.**" United States ex rel. Williams v. Twomey, 510 F.2d 634, 640 (CA7), cert. denied sub nom. Sielaff v. Williams, 423 U.S. 876 (1975).

United States v. Cronic, 446 U.S. 648, 656-67 (1984) (emphasis added).

### A.  Trial Counsel's Failure to Challenge Biased Jurors Was Ineffective

108.  The Sixth Amendment guarantees criminal defendants the right to a fair trial by an impartial jury.  Skilling v. United States, 561 U.S. 358, 438 (2010), citing Irvin v. Dowd, 366 U.S. 717, 723 (1961)). The purpose of voir dire is to determine whether prospective jurors can render an impartial verdict based solely on the evidence and the court's instructions.  Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).

109.  The fairness of a trial is doubtful when a veniremember reveals that he or she "has such a fixed opinion, based on [his or her] bias [or a presumed bias], that [he or she] 'could not judge impartially the guilt of the defendant.'" Depree v. Thomas, 946 F.2d 784, 788 (11th Cir. 1991) (quoting Patton v. Yount, 467 U.S. 1025, 1035 (1984)).

110.  When a trial court is confronted with a biased juror, the judge must, either sua sponte or upon a motion, dismiss the prospective juror for cause.  Frazier v. United States, 335 U.S. 497, 511 (1948).

111.  "Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors

who are biased against the defense." <u>Miller v. Francis</u>, 269 F.3d 609, 615 (6th Cir. 2001); <u>see</u>

<u>United States  v. Blount</u>, 479 F.2d 650, 651 (6th Cir. 1973) ("The primary purpose of the voir dire

of jurors is to make possible the empanelling of an impartial jury through questions that permit the

intelligent exercise of challenges by counsel." ); <u>see also</u> <u>Mu'Min v. Virginia</u>, 500 U.S. 415, 431

(1991) (stating that voir dire "serves the dual purposes of enabling the court to select an impartial

jury and assisting counsel in exercising peremptory challenges").

    112.  <u>Miller v. Webb</u>, 385 F.3d 666 (6th Cir. 2004) is instructive.  In that case, during jury

selection, one of the veniremembers told the trial court that she knew one of the prosecution

witnesses, but stated several times "I think I could be fair" and "I believe I could be fair about it

all" and words to that effect.  The trial attorney failed to exercise challenges against the jury, and

the juror was seated, and petitioner convicted.  Later, Miller petitioned for Federal habeas corpus

relief, arguing ineffective assistance of counsel.  The District Court denied relief.

    113.  The Sixth Circuit reversed and granted habeas relief, finding that trial counsel's

failure to challenge a biased juror resulted in ineffective assistance of counsel.  In so deciding, the

Court held that "[w]hen a venireperson expressly admits bias on voir dire, without a court response

or follow-up, for counsel not to respond [to the statement of partiality] in turn is simply a failure

'to exercise the customary skill and diligence that a reasonably competent attorney would provide.'"

<u>Id</u>. <u>at</u> 672, <u>quoting</u> <u>Hughes v. United States</u>, 258 F.3d 453, 457 (6th Cir. 2001).

    114.  In this case, the trial court itself acknowledged in its November 9, 2017 Order

summarily denying Claim II of the Rule 3.850 motion, "after the jury was selected, trial counsel

allegedly admitted to [Petitioner] that he erred by failing to strike the juror and suggested that it

would be a ground for a postconviction motion."

115.  Normally, a post-conviction relief motion will be rebutted any an affidavit of counsel. The record in this case contains no such statements by counsel concerning his effectiveness.  The only thing apparently considered by the post-conviction court was the transcript of the jury selection itself – which the Second District Court of Appeal acknowledged was insufficient to consider a claim of ineffective assistance.

116.  Here, like <u>Miller v. Webb</u>, Juror # 11 made statements that clearly established that the juror had prior knowledge of the case and was biased because they did not want to see the Casey Anthony case repeat itself.  Like <u>Miller v. Webb</u>, trial counsel did not follow up on that inquiry, or challenge Juror # 11 for cause.  Ultimately, Juror #11 served on the jury which found Stoddard guilty as charged.  This was clearly deficient performance.

117.  Similarly, Juror #12 indicated that he had prior knowledge about the case and questioned his own ability to be impartial. Trial counsel moved to strike Juror #12 for cause and the court denied his request reasoning that based on the totality of his responses, he indicated that he could be fair.

118.  Subsequently, trial counsel did not use a peremptory strike to remove Juror #12 from the venire. After exercising all peremptory challenges, trial counsel failed to request an additional peremptory strike due to the court's failure to grant his request to strike Juror #12 for cause and failed to indicate which juror he would strike if he was granted an additional peremptory challenge. Because of these failures, the trial court's refusal to remove Juror #12 for cause was not preserved for appellate review.

119.  As a result, Juror #12 served on the jury which convicted Stoddard on all counts. This was deficient performance under the Sixth Amendment.

120.  Moreover, the failure for counsel to effectively challenge both seated jurors resulted in actual prejudice – the seating of biased, unqualified jurors.  Thus, Petitioner has satisfied both prongs of <u>Strickland</u>.

*B.  The Failure to Move to Suppress Petitioner's Statements to Law Enforcement After He Invoked his Fifth Amendment Right to Remain Silent Constituted Ineffective Assistance*

121.  The Fifth Amendment of the United States Constitution protects the right of the accused to remain silent.  For 57 years, the Supreme Court has held that once invoked, a defendant's Fifth Amendment right to remain silent must be "scrupulously honored."  <u>See</u> <u>Michigan v. Mosley</u>, 423 U.S. 96, 104 (1975) <u>quoting</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 473-474 (1966).  Failure on the part of law enforcement to do so renders the statement subject to suppression.

122.  The Eleventh Circuit has recognized that "[a] confession is like no other evidence.  Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'"  <u>Mansfield v. Secretary, Department of Corrections</u>, 679 F.3d 1301, 1314 (11th Cir. 2012), <u>quoting</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).  Every other Circuit Court in the United States has likewise recognized the devastating impact of the admission of a defendant's incriminating statement against him at trial.  <u>See</u> <u>United States v. Carrasco</u>, 540 F.3d 43 (1st Cir. 2008); <u>Zappulla v. New York</u>, 391 F.3d 462 (2d. Cir. 2004); <u>United States v. Brownlee</u>, 454 F.3d 131 (3d. Cir. 2006); <u>United States v. Gillion</u>, 704 F.3d 284 (4th Cir. 2012); <u>United States v. Avants</u>, 278 F.3d 510, 522 (5th Cir. 2002) (holding a defendant's incriminating statement is "powerful evidence of guilt, the admission or exclusion of which would be highly likely to affect the outcome of the trial"); <u>McCray v. Metrish</u>, 232 F.3d 469 (6th Cir. 2007); <u>United States v. Felming</u>, 594 F.2d 598 (7th Cir. 1979); <u>Lufkins v. Leapley</u>, 965 F.2d 1477 (8th Cir. 1992); <u>Hayes v. Brown</u>, 399 F.3d 972 (9th Cir. 2005); <u>United States v. Perdue</u>, 8 F.3d 1455 (10th Cir. 1993).

123.  As a result, numerous courts have held that a failure on the part of an attorney to move to suppress incriminating statements taken in violation of a defendant's Constitutional rights constitutes ineffective assistance of counsel.  See Martin v. Maxey, 98 F.3d 844, 848 (5th Cir. 1996), Kirkpatrick v. Butler, 870 F.2d 276, 283 (5th Cir.1989), cert. denied, 493 U.S. 1051 (1990); Thomas v. Varner, 428 F.3d 491, 495 (3d Cir. 2005) (ineffective assistance of counsel for failing to suppress unduly suggestive identification), Morrison v. Kimmelman, 752 F.2d 918, 922  (3d Cir. 1985) affirmed on other grounds 477 U.S. 365 ("proper norms of advocacy" required a "timely [motion] to suppress" where there was a valid basis for suppression), Rodriguez v. Young, 906 F.2d 1153, 1161 (7th Cir. 1990) (failure to move to suppress identification "objectively unreasonable"), Cossel v. Miller, 229 F.3d 649, 654-655 (7th Cir. 2000) (holding ineffective assistance of counsel for failure to move to suppress the "pivotal evidence in the case").

124.  In United States v. McGrew, 397 Fed.Appx 87 (5th Cir. 2010), the defendant was arrested and charged with possessing a firearm as a convicted felon where police found a rifle in his residence and the defendant admitted that he knew the rifle was present, and further admitted to possession of marijuana.  After the defendant was convicted at trial, he filed a petition for habeas corpus, which was denied without a hearing.  This Court reversed and remanded for an evidentiary hearing, holding that in light of the "devastating impact of that statement, it is impossible to conclude without further factual development that [defense] counsel's decision not to file a motion to suppress was 'strategic, conscious, and informed.'" Id. at 94.

125.  In United States v. Cavitt, 550 F.3d, 430, 440 (5th Cir. 2008), the defendant's attorney failed to move to suppress incriminating statements made by the defendant to police officers.  After the defendant pled guilty, but prior to sentencing, he discovered that the statements were suppressible, fired his attorney, retained new counsel, and sought to withdraw his guilty plea,

arguing ineffective assistance.  The court denied his motion, and the defendant filed a petition for habeas corpus, which was denied without a hearing.  This Court reversed that denial and remanded for an evidentiary hearing, holding that there was insufficient evidence to conclude that failure of counsel to move to suppress was a "strategic, conscious, and informed."  Id. at 441.

126.  In Tice v. Johnson, 647 F.3d 87 (4th Cir. 2011), the petitioner invoked his right to remain silent and his right to counsel during questioning by police, however the police continued to question him, eliciting incriminating statements.  The incriminating statements were the most damaging evidence against him at trial.  After exhausting his state court remedies, the petitioner sought federal habeas relief, which was granted.  In affirming the granting of a writ of habeas corpus, the Fourth Circuit held defense counsel's failure to move to suppress the statements constituted ineffective assistance.  Id. at 111.

127.  Here, in the second interview with Stoddard, Detective Northfield asked Stoddard to voluntarily answer questions. The interrogation was conducted in a separate room at the hospital where M.S. was being treated. Stoddard, Detective Northfield, and Detective Stephanie Graham were present and Northfield informed Stoddard that she was recording the interrogation.  The purpose of the interrogation was to uncover the facts and circumstances that led to M.S.'s hospitalization. Throughout the course of the questioning, Northfield referenced evidence that was recovered from Stoddard's residence such as large quantities of duct tape and the plywood board. She also told Stoddard that a neighbor informed law enforcement that he heard abuse going on inside the home for months. After Stoddard invoked his right to remain silent, questioning continued, and Stoddard admitted that he restrained M.S.

128.  The third interrogation was conducted for the same purpose and was conducted in an interrogation room at the police station. Prior to questioning, Detective Northfield advised

Stoddard of his <u>Miranda</u> rights. During the course of the interrogation, Stoddard was accused of not being forthcoming with Northfield.  Again, Petitioner indicated that he wanted to remain silent and cease answering questions, and again, his request was not honored.  Again, interrogation continued and he made statements that were later used against him at trial.

129.   The subject statements were introduced into evidence at trial, and used throughout the trial as admissions of guilt by the prosecution.  The State's closing argument dedicated a majority of its time to Petitioner's statements to law enforcement as proof of guilt, below of which appears but a small sampling:

> We know that she was bound and gagged on a regular basis. We know this, that the defendant knew this and participated in this but he at least knew that Misty was doing it because, first of all, Jarrett Eastman's statement, the teenage son that was in the house, and the defendant's statements himself. He talked about it.  He talked about the first straps were thin, they were old car tie downs and they caused wounds, so he went out and got thicker straps and used painter's tape around the old wounds underneath the thicker straps so as to try and not injure her anymore. He talked about, We put a belt over her thighs to keep her secure.  He talked about duct taping her, duct taping her hands to her belt loops, the helmet on her head.
> ...
> The defendant even talked about [M.S.] being hogtied, hogtied. That's his word, "hogtied." Whether he said it to Detective Northfield or not in that one conversation, it doesn't matter, because he said it to everyone else. He said it to the Child Protection Team lady. He said it to the police officer in St. Pete, and he talked about [M.S.] being tied to this board with ahelmet.
> ...
> The most telling about the defendant is how casually he talked about this. Did you notice that? In his own statement, three hours or whatever it was that we all watched, Well, yeah, we used some straps and they were the car tie downs at first, but they caused wounds so we got some bigger straps and put the painter's tape around and -- really? Just totally casual like there's nothing wrong with this. There's nothing wrong with strapping your daughter down to a board at night when she can't move or at any time.
> ...

> Even in his own words, he knew and he knew he should have done
> something. He spoke to Kim Northfield a lot and he said several
> interesting things that I'm going to read to you now.

130.   Because trial counsel's failure to file a motion to suppress was based on a misunderstanding of the law, his so called "strategic decision" is entitled to less deference. See Hardwick v. Crosby, 320 F.3d at 1186. Had trial counsel conducted an adequate amount of research into the issue, he would have been able to at least make a good faith argument in favor of suppressing the statements and his failure to file the motion was objectively unreasonable given the reason he provided on the record.

131.   The record also conclusively establishes that trial counsel blatantly lied to the court when questioned whether Stoddard approved of his decision to not file a motion to suppress and did not even advise Stoddard of this strategy.

132.   Under these circumstances, Petitioner's statements were the key evidence against him in his trial and clearly subject to suppression.  The failure on the part of counsel to move to suppress them constituted deficient performance, and the prejudice was clear from the closing arguments, which utilized what should have been inadmissible evidence against Petitioner to great effect.

133.   The state court decision failed to discuss the legal issues with respect to this claim, and in doing so, was contrary to clearly-established Federal Constitutional law.  The trial court made no mention of the invocation of the Fifth Amendment right, and focused only on whether Petitioner was in custody when he made the subject incriminating statements.  This was contrary to clearly-established Supreme Court precedent which makes no distinction between a custodial invocation and a non-custodial invocation.

134.   Again, the lack of any affidavit or statements by trial counsel – other than his representation on the record at trial, which was immediately rebutted by Petitioner – speaks

volumes. Thus, the state court's decision was based on an unreasonable determination of the facts, which in light of the entire record, lead to the conclusion that trial counsel's failure to move to suppress was not based on any legitimate strategic or tactical decision, but simply based on a lack of diligence.

135.  Accordingly, habeas relief is warranted on this claim.

*C. Conclusion*

136.  In his direct appeal to the Second District Court of Appeal, Docket # 2D14-5316, Petitioner raised several issues, including a claim of ineffective assistance of counsel based upon trial counsel's failure to challenge Juror # 11 and Juror # 12.[2]  The issue was framed as follows:

> Trial Counsel Was Ineffective Where He Failed to Challenge a Biased Juror For Cause, Failed to Preserve the Court's Denial of a Challenge for Cause for Appellate Review, and Failed to Effectively Use Peremptory Challenges

137.  On April 20, 2016, the Second District Court of Appeal issued a per curiam decision, which stated as follows:

> We affirm on all issues. However, we do so without prejudice to Mr. Stoddard's filing of a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. See *Dante v. State*, 903 So. 2d 293, 297 (Fla. 3d DCA 2005) (rejecting claim of ineffective assistance of counsel on the face of the record for erroneously withdrawing challenge to juror but affirming without prejudice to appellant's filing of a postconviction motion); *Jenkins v. State*, 824 So. 2d 977, 983 n.1 (Fla. 4th DCA 2002) ("In a situation where the record demonstrates that an ostensibly biased juror served on a jury, without objection, **then a hearing is appropriate to see if the defense attorney had a tactical reason for not challenging the juror for cause**.").

Stoddard v. State, 189 So. 3d 1046, 1047 (Fla. 2DCA 2016) (emphasis added).

---

[2] Other claims of ineffective assistance were set forth as well in the direct appeal, which are also raised in Defendant's motion for post-conviction relief.

139.   Following this clear directive, Petitioner filed a Rule 3.850 motion raising the identical claim.  However, the trial court summarily denied that claim without a hearing.

140.   In Williams v. Taylor, 529 U.S. 420 (2000), the Supreme Court held that a Federal habeas petitioner cannot be penalized for failing to develop a sufficient factual basis of a claim in state court proceedings if the applicant has diligently sought to develop the factual basis of a claim for habeas relief but has been denied the opportunity to do so by the state court.  In doing so, the Supreme Court adopted the approach taken by both the Eleventh Circuit and the Fourth Circuit on this exact question.  See Arvelo v. Secretary, Florida Department of Corrections, 788 F.3d 1345 (11th Cir. 2015); Cardwell v. Greene, 152 F.3d 331 (4th Cir. 1998).

141.   In these circumstances, Federal courts have held that a District Court has the power to order an evidentiary hearing pursuant to 28 U.S.C. § 2254(d)(1), (e)(2), and Cullen v. Pinholster, 563 U.S. 170 (2011).

142.   This case is analogous to Arvelo v. Secretary, Florida Department of Corrections, 788 F.3d 1345 (11th Cir. 2015).  In Arvelo, the habeas petitioner filed a Rule 3.850 motion in the Florida state court alleging ineffective assistance of counsel. Id. The state court denied his motion without holding an evidentiary hearing, and Arvelo applied for habeas relief. Id.  The District Court denied habeas relief, relying upon the lack of a factual basis for Arvelo's claims. Id.  The Eleventh Circuit granted a Certificate of Appealability, reversed and remanded District Court to hold an evidentiary hearing. Id.  In so doing, the Eleventh Circuit specifically found that because neither the state court nor the District Court permitted Arvelo the opportunity to develop the factual basis for his claims, summary denial was improper. Id.

143.   Here, the state post-conviction court did exactly the same – it denied Petitioner the ability to present witnesses and evidence to further develop his claims **three times**, ignored the

vast majority of his evidence, and then used the lack of a factual record justification for the denial.

Accordingly, this Court should order an evidentiary hearing on his claims.

      WHEREFORE, Petitioner prays that this Court:

      (A) Issue a Writ of Habeas Corpus ordering that the Petitioner be released from his confinement upon a personal recognizance bond; or in the alternative,

      (B)  Issue a Writ of Habeas Corpus ordering that the Petitioner be released from his confinement unless the judgment of conviction and sentence are vacated, and he be restored to pre-trial status if he is not retried within sixty days; or in the alternative,

      (C) Order that the determination of this Petition be held in abeyance pending final resolution of any state court pending matters concerning the judgment of conviction attacked in this petition; and

      (D)  Grant such other and further relief as this Court may deem just, proper and equitable.

Dated: February 16, 2023                Respectfully Submitted,

                                                  _____

                                              Patrick Michael Megaro, Esq.
                                              Halscott Megaro, P.A.
                                              2431 Aloma Avenue, Suite 124
                                              Winter Park, Florida 32792
                                              (o) 407-255-2164
                                              (f) 855-224-1671
                                              jhalscott@halscottmegaro.com
                                              Florida Bar ID # 738913
                                              Attorney for Petitioner