UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KENNETH WAYNE STODDARD,

     Petitioner,

v.                                                                    CASE NO. 8:23-cv-358-JLB-NHA

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## **ORDER**

Before the Court is the 28 U.S.C. § 2254 petition for habeas corpus relief

filed, through counsel, by Kenneth Wayne Stoddard (Petitioner).  (Doc. 1).

Petitioner is a prisoner of the Florida Department of Corrections serving an

aggregate sentence of sixty-five years in prison for aggravated manslaughter of a

child under the age of eighteen by culpable negligence, aggravated child abuse, and

tampering with evidence.  (*Id.*).  At the Court's direction (Doc. 3), Respondent filed

a response (Doc. 6).

Upon careful consideration of the pleadings, the state court record, and the

entire file, the Court concludes that Petitioner is not entitled to federal habeas

corpus relief.[1]

## I. Background and Procedural History

In July of 2012, Petitioner's eleven-year-old daughter, M.S., moved from her mother's home to Petitioner's and his wife, Misty Stoddard's (Misty), home.  (Doc. 6-2 at 1090, 1104).[2]  M.S. had autism that caused her to have behavioral issues like tantrums and hitting herself.  (*Id.* at 1425, 1455–56, 1576, 1657, 1660).  M.S.'s behavior caused stress in the home, and both Petitioner and Misty frequently screamed at her.  (*Id.* at 1428–30).  Eventually, both Petitioner and Misty would tie M.S. to a wooden board when it was time for her to sleep.  (*Id.* at 1435–37, 1458–59).  While M.S. was tied to the board, both Petitioner and Misty would put duct tape over her face and mouth.  (*Id.* at 1438–39).  They also put a helmet on M.S.'s head and tied it down to the board.  (*Id.* at 1440–41).  At times, Misty would put a sock in M.S.'s mouth, then cover her mouth with duct tape.  (*Id.* at 1441).

On the night of December 12, 2012, M.S. suffocated and was rushed to the hospital, where she remained brain-dead until she passed away on December 17, 2012.  (*Id.* at 1687, 1730–32, 1888).  While M.S. was still in the hospital, Petitioner went home and, with his stepson, Jeremy Eastman's assistance, disposed of the wooden board in the woods near their home.  (*Id.* at 1448–49).

---

[1] Because the Court was able to resolve the petition on the record, an evidentiary hearing is not warranted.  *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

[2] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

A jury convicted Petitioner of aggravated manslaughter of a child under 18 by culpable negligence, aggravated child abuse, and tampering with evidence. (*Id.* at 22–23).[3] The trial court sentenced Petitioner to 65 years in prison. (*Id.* at 25–30). Florida's Second District Court of Appeal (Second DCA) affirmed the convictions and sentences without prejudice to Petitioner pursuing his claims of ineffective assistance of trial counsel in a motion for postconviction relief. (*Id.* at 165–66).

Thereafter, Petitioner, through counsel, filed a motion, and subsequently, an amended motion, for postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure (collectively, Rule 3.850 Motion). (*Id.* at 170–278, 307–27). The postconviction court denied the Rule 3.850 Motion without an evidentiary hearing. (*Id.* at 528–55). The Second DCA affirmed without a written opinion. (*Id.* at 563).

Petitioner, through counsel, timely filed the petition for habeas corpus relief before the Court for its consideration. (Doc. 1).

## II. Governing Legal Principles

### A. The Antiterrorism Effective Death Penalty Act (AEDPA)

Under the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[3] Misty Stoddard was tried separately and convicted of felony murder. *See Stoddard v. State*, 185 So. 3d 696, 697 (Fla. 2d DCA 2016).

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  In this context, "clearly established federal law" consists of the governing legal principles, and not the dicta, set forth in the decisions of the United States Supreme Court at the time the state court issued its decision.  *White v. Woodall*, 572 U.S. 415, 420 (2014); *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is contrary to clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.  *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).  A decision involves an unreasonable application of clearly established law if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000) (quoting *Williams*, 529 U.S. at 406).

- 4 -

The section 2254(d) standard is both mandatory and difficult to meet.  To demonstrate entitlement to federal habeas relief, the petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *White*, 572 U.S. at 420 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  Moreover, when reviewing a claim under section 2254(d), a federal court must presume that any "determination of a factual issue made by a State court" is correct, and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e).

A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits, warranting deference.  *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008).  Generally, in the case of a silent affirmance, a federal habeas court will "look through" the unreasoned opinion and presume that the affirmance rests upon the specific reasons given by the last court to provide a reasoned opinion.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991); *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  However, the presumption that the appellate court relied on the same reasoning as the lower court can be rebutted "by evidence of, for instance, an alternative ground that was argued [by the state] or that is clear in the record" showing an alternative likely basis for the silent affirmance.  *Sellers*, 138 S. Ct. at 1196.

**B. Ineffective Assistance of Counsel**

In *Strickland v. Washington*, the Supreme Court established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance. 466 U.S. 668, 687–88 (1984). A petitioner must establish that counsel's performance was deficient and fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *Id.* A showing on only one prong will not support an ineffective assistance claim. *Id.* at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.").

The focus of inquiry under *Strickland*'s performance prong is "reasonableness under prevailing professional norms." *Id.* at 688. In reviewing counsel's performance, a court must adhere to the presumption that "counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689 (citation omitted). A court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," applying a highly deferential level of judicial scrutiny. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Proving *Strickland* prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

## III. Discussion

**"CLAIM I – BECAUSE PETITIONER WAS NOT TRIED BEFORE AN IMPARTIAL, UNBIASED JURY, AND THE STATE COURT'S DECISION OTHERWISE WAS CONTRARY TO CLEARLY-ESTABLISHED FEDERAL CONSTITUTIONAL LAW AND AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE RECORD, THIS COURT SHOULD GRANT THE INSTANT HABEAS CORPUS PETITION"**

Petitioner contends that he was denied a fair trial because his jury was not impartial.  Specifically, he contends that he was denied a fair trial by an impartial jury because Jurors 11 and 12 should have been struck for cause during jury selection.  Petitioner's claim is procedurally barred because: (1) trial counsel neglected to move to strike Juror 11 in the first instance, making his claim procedurally defaulted in Florida state court, and (2) Petitioner failed to include in his argument on direct appeal to the Second DCA that he did not have an impartial jury because Juror 12 was not struck for cause.

He first contends that Juror #11's comment that he "wouldn't want to see another Casey Anthony case" shows "that Juror # 11 already formed an opinion that Stoddard was guilty[,] and he would not want to see another person who was responsible for the death of their own child be found not guilty."[4]  (Doc. 1 at 21). Petitioner also argues that Juror #11 was not impartial because he "had some knowledge about the case due to a relationship with a court reporter who had

_____

[4] The "Casey Anthony" case was a high-profile case in Florida where the defendant, Casey Anthony, was accused of being responsible for the death of her young daughter and was found not guilty.

performed some work on the case, [and] had several strong opinions regarding treatment of children . . . ." (*Id.* at 23).

Second, Petitioner also asserts Juror #12 was biased against him and should have been dismissed for cause. Specifically, he contends that Juror #12 "indicated that he had prior knowledge of the facts of the case from reading about the co-defendant, Misty Stoddard's, trial . . . ." (*Id.* at 7). Petitioner also contends that the following discussion between Juror #12 and the trial court reveals that Juror #12 was unable to be impartial:

> PROSPECTIVE JUROR 12: We're talking about an issue of two different people here, and it's very closely related, and it's really difficult for me to separate one from the other.
>
> THE COURT: What two people are you talking about, [R.D.]?
>
> PROSPECTIVE JUROR 12: I'm talking about [M.S.] and Kenneth Stoddard.
>
> THE COURT: You're talking about the victim, [M.S.], and the defendant, Mr. Stoddard?
>
> PROSPECTIVE JUROR 12: Yes. In talking about those, it's really difficult for me to separate the one from the other, although basically that is what we're doing here. We're not – there's nothing that can be done for [M.S.] at this point, nothing is going to bring her back. And we are trying to find some justice for Kenneth Stoddard, whatever that is. **And my personal concern is whether or not I can look at the evidence and forget about where she is at this point, and still be fair and impartial as far as what the evidence proves. It's not that I don't think I can do it. I can do it, although I think that it will be very emotional.**

(*Id.* at 8) (emphasis in original).

Respondent argues that this claim is procedurally barred.  (Doc. 6 at 13).
The Court agrees.  First, to the extent that Petitioner contends here that he was denied a fair trial because Juror #12 was not impartial, Petitioner failed to present that claim to the state appellate court.  In the substantive denial of a fair trial claim that Petitioner raised in his Initial Brief on direct appeal, he asserted that he was denied a fair trial only because the trial court failed to dismiss Juror #11 for cause.  (Doc. 6-2 at 72–75).  Thus, to the extent here Petitioner contends that he was denied a fair trial because Juror #12 was not dismissed for cause, he never presented an issue with Juror 12's purported partiality to the state appellate court, and it is thus deemed procedurally defaulted.  *See Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.").[5]

Second, the Court agrees with Respondent (*see* Doc. 6 at 13) that Petitioner's claim that he was denied a fair trial because the state court failed to dismiss Juror #11 for cause is procedurally barred because it was never presented in the trial court in the first instance.  In Florida, "to preserve challenges for cause to prospective jurors, the defendant must 'object to the jurors, show that he or she has

_____

[5] Petitioner concedes in his habeas petition that "the trial court's refusal to remove Juror #12 for cause was not preserved for appellate review."  (Doc. 1 at 28, ¶ 118).

exhausted all peremptory challenges and requested more that were denied, and identify a specific juror that he or she would have excused if possible.'"  *Matarranz v. State*, 133 So. 3d 473, 482 (Fla. 2013) (quoting *Kearse v. State*, 770 So. 2d 1119, 1128 (Fla. 2000)).  In his Initial Brief on direct appeal, Petitioner *conceded that defense counsel* "never moved to strike Juror #11 for cause nor did he exercise a peremptory challenge to remove him from the jury panel." (Doc. 6-2 at 89). Consequently, the issue was not preserved for appeal in the Florida courts in the first instance, rendering it procedurally barred there.

Indeed, the State argued in its Answer Brief in the direct appeal that Petitioner's claim was "not preserved for appeal" because Petitioner "did not object[.]" (*Id.* at 130).  The appellate court affirmed without explaining the reasons for its decision. (*Id.* at 165–66).  This Court must presume that the affirmance rested on the procedural bar asserted in the State's brief.  *See Zeigler v. Crosby*, 345 F.3d 1300, 1310 (11th Cir. 2003) ("[W]hen a state court issues a summary denial on a claim that is procedurally barred and nothing in the disposition discusses the merits of the federal claim, we cannot assume that had the state court explained its reasoning, it would have reached the merits of the claim."); *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993) ("[W]e may not assume that had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of this case."); *Bennett v. Fortner*, 863 F.2d 804, 807 (11th Cir. 1989) ("This circuit to a point has presumed that when a procedural default is asserted on

appeal and the state appellate court has not clearly indicated that in affirming it is reaching the merits, the state court's opinion is based on the procedural default."). Thus, Claim One is barred from habeas review.

The resolution of Claim One on state procedural grounds results in a procedural default, and the claim is therefore barred from federal habeas review unless Petitioner establishes either cause and prejudice for the default or a fundamental miscarriage of justice. *Harris v. Reed*, 489 U.S. 255, 262 (1989). After careful review, even if Petitioner's claim were not procedurally defaulted, Petitioner's argument turns on an unsupported, conclusory assumption that these jurors had predetermined his guilt and were thus incapable of rendering an impartial verdict. At bottom, after the trial judge's thorough examination, both Jurors 11 and 12 stated that they could set aside any personal feelings and anything they may have heard about the case prior to the start of trial, and not determine Petitioner's guilt or innocence until after presentation of all the trial evidence and in accordance with the law and that evidence. *See* Doc. 6-2 at 8, 209–11 (Juror 11); *id.* at 70, 212, 784 (Juror 12).

Thus, Petitioner fails to establish either cause and prejudice for the default or a fundamental miscarriage of justice.

**"CLAIM II – BECAUSE THE STATE COURT'S DETERMINATION THAT PETITIONER RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS WHERE HIS TRIAL ATTORNEY FAILED TO EFFECTIVELY CHALLENGE BIASED JURORS AND FAILED TO FILE A MOTION TO SUPPRESS WAS CONTRARY TO CLEARLY-ESTABLISHED FEDERAL CONSTITUTIONAL LAW AND WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED BY PETITIONER WITH HIS POST-CONVICTION RELIEF MOTION AND THE LACK OF EVIDENCE TO THE CONTRARY, HABEAS RELIEF IS WARRANTED"**

### A. Claim II(A)

Petitioner contends that trial counsel was ineffective for failing to challenge Juror #11 and Juror #12 because they were biased against him.  (Doc. 1 at 26–29). Petitioner states that "Juror #11 made statements that clearly established that [he] had prior knowledge of the case and was biased because [he] did not want to see the Casey Anthony case repeat itself."  (*Id.* at 28, ¶ 116).  Petitioner argues that counsel was ineffective for failing to "follow up on that inquiry, or challenge Juror #11 for cause."  (*Id.*).

Concerning Juror #12, Petitioner asserts that "he had prior knowledge about the case and questioned his own ability to be impartial."  (*Id.* at 28, ¶ 117). Petitioner asserts that although counsel moved to strike Juror #12 for cause, which was denied, "the trial court's refusal to remove Juror #12 for cause was not preserved for appellate review" because "trial counsel did not use a peremptory strike to remove Juror # 12 from the venire [and,] [a]fter exercising all peremptory challenges, . . . failed to request an additional peremptory strike . . .and . . . indicate

which juror he would strike if he was granted an additional peremptory challenge."

(*Id.* at 28, ¶ 118).

In state court, Petitioner raised this claim in his Rule 3.850 motion.  (Doc. 6-2 at 190-93).  In denying the claim, the state post-conviction court stated:

> Defendant raises several claims related to counsel's performance during voir dire. To establish that counsel was ineffective for failing to make or preserve a cause challenge, a defendant must establish that an actually biased juror sat on the jury. *See Hall v. State*, 212 So. 3d 1001, 1015-16 (Fla. 2017). "Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial—*i.e.*, that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." *Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007).
>
> Defendant first asserts that trial counsel should have challenged juror # 11 for cause. This juror indicated that he may have had some discussion about the case with his spouse, who worked as a court reporter, and he learned some information about the case through the media. Asked whether this information caused him to form any definite opinion about the guilt or innocence of Defendant, he replied "not really" before conceding "maybe deep down inside I probably have, but I want to hear all the facts." Upon further questioning, the juror clarified that he meant the facts he learned caused him to believe there was "some wrongdoing someplace," but he emphasized he had not made any determination about Defendant's guilt or innocence. He also noted that despite learning information through the media, he did not trust the media to present all the facts accurately. The juror stated he had no doubt about his ability to set aside any prior information and apply the law given by the Court to the facts presented at trial.
>
> Later, the venire was asked whether, due to the length of the trial, their decision would be impacted by a desire to avoid protracted deliberation. Juror #11 responded that his decision would not be so swayed because he "wouldn't want to see another Casey Anthony case." In an affidavit attached to the present motion, Defendant asserts that after this comment, trial counsel indicated that juror #11 needed to be removed, but took no action to do so. The juror ultimately served on

- 13 -

the jury that convicted Defendant. After the jury was selected, trial counsel allegedly admitted to Defendant that he erred by failing to strike the juror and suggested that it would be a ground for a postconviction motion.

Having considered the voir dire, the Court finds Defendant has failed to demonstrate that juror # 11 was actually biased against him. The juror clarified that he had no doubt in his ability to set aside previously-learned information and apply the law given to the facts presented at trial, and he affirmatively stated that he had not formed any fixed opinion about Defendant's guilt. Within the context of the questioning, the juror's comment about Casey Anthony at best demonstrates his belief that the jurors in an unrelated child homicide case reached an incorrect verdict based on a desire to avoid protracted deliberation. This fails to show actual bias against Defendant in this case.

Defendant next asserts that trial counsel should have preserved the Court's denial of a motion to strike juror # 12 for cause. This juror indicated that he read media reports about the case and the codefendant's prior trial, but had not formed any fixed opinions about Defendant's guilt or innocence. Despite the information he had learned, he stated he did not yet know "what actually took place" and would be able to set aside this information to make a decision based on the evidence presented at trial. The juror later expressed that while nothing could undo the victim's death, and the focus of the case was justice for Defendant, it would be difficult for him to separate the two, "forget about where [the victim] is at this point, and still be fair and impartial ...." Trial counsel asked whether the juror had any doubts about his ability to be fair and impartial, and he responded "I think I can do it, but I don't think that this is going to be an easy thing to do." Trial counsel moved to strike juror #12 for cause. The Court denied the challenge, finding that based on the totality of the juror's responses, it believed he could be fair and impartial. Trial counsel did not use a peremptory strike, request an additional peremptory strike based on the ruling, nor indicate which juror he would have stricken if granted an additional peremptory strike.

Again, Defendant has failed to demonstrate that juror #12 was actually biased against him in this case. The juror stated that he knew Defendant "was one of the parties involved and that he was arrested,"

- 14 -

but otherwise was unaware of the events that actually took place. The juror also stated that he would be able to set aside any prior knowledge about the case and make a decision based on the facts presented at trial. While the juror later expressed that it would be difficult for him to separate the victim's death from the issue of justice for Defendant, he nonetheless advised that he would be able to do so. The undersigned agrees with the observation of the trial judge that this juror candidly described the likely feelings of all potential jurors in this case: that they faced a difficult task. None of these matters demonstrate[s] actual bias.

Finally, Defendant asserts that trial counsel should have used peremptory strikes to remove juror # 11 and juror # 12. In light of the above determination that Defendant has failed to demonstrate actual bias on the part of either juror, this claim is denied.

(*Id.* at 282–84) (footnotes omitted).  The appellate court affirmed without a written opinion.  (*Id.* at 563).

The state courts' denial of this claim was reasonable.  A criminal defendant has a right to an impartial jury, and a prospective juror who lacks impartiality must be excused for cause.  *See Ross v. Oklahoma*, 487 U.S. 81, 85–86 (1988).  To exclude a prospective juror for cause, a party "must demonstrate that the juror in question exhibited actual bias by showing either an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed."  *United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993); s*ee also Smith v. Phillips*, 455 U.S. 209, 215 (1982).  The burden is on the challenger to show the prospective juror has sufficient actual bias to raise the presumption of partiality.  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

Under Florida law, the test for determining juror competency is "whether the

- 15 -

juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court." *Lusk v. State*, 446 So. 2d 1038, 1041 (Fla. 1984).  In an unpublished opinion, the Eleventh Circuit explained that a postconviction petitioner must show actual bias to prove *Strickland* prejudice resulting from juror bias:

> In the post-conviction context...Florida has an actual bias requirement. *See Carratelli v. State*, 961 So. 2d 312, 323 (Fla. 2007). "[W]here a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was *actually* biased." *Id*. at 324 (emphasis added). To meet the actual bias standard, "the defendant must demonstrate that the juror in question was not impartial—i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." *Id*.

*Fennell v. Sec'y, Fla. Dep't of Corr.*, 582 F. App'x 828, 832 (11th Cir. 2014).

While Petitioner argues that both Juror #11 and Juror #12 had prior knowledge about his case and made statements that showed they could not be impartial, he presents no evidence that either was "actually biased" against him. When questioned by the trial court, Juror #11 said that he had no "fixed opinion about" Petitioner and had no doubt "whatsoever" that he could set aside the information he had learned about the case and "render a verdict according to the law and evidence."  (Doc. 6-2 at 647–51).  Juror #12 stated that although he had heard about the case from the news, he did not "have that many details about what actually took place[,]" and he believed he could set that information aside and only consider the facts presented in court.  (*Id*. at 651–54).  Moreover, all the jurors took

- 16 -

an oath to "render a true verdict according to the law and the evidence." (*Id.* at 952). "Jurors are presumed to follow the law as instructed by the trial court and to comply with their oaths." *Fennel*, 582 F. App'x at 834.

Even if Juror #11 and Juror #12 learned some details about the case from the news or from a family member, the Supreme Court has explained that "juror *impartiality*. . . does not require [juror] *ignorance.*" *Skilling v. United States*, 561 U.S. 358, 381 (2010) (emphases in original) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (noting that jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.")); *Reynolds v. United States*, 98 U.S. 145, 155–56 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."). With no evidence that Juror #11 and Juror #12 were actually biased by their exposure to the news or a family member with information about the case, the Court must presume that they followed the trial judge's instructions and were fair and impartial during deliberations.

Petitioner also contends that Juror #11 showed he was biased against Petitioner by stating, "I wouldn't want to see another Casey Anthony case." (Doc. 6-2 at 920). But the state postconviction court found that the comment "at best

- 17 -

demonstrates [Juror #11's] belief that the jurors in an unrelated child homicide case reached an incorrect verdict based on a desire to avoid protracted deliberation." (*Id.* at 283).[6]  The record supports that finding.  Juror #11 made that statement not to express a pre-determined belief that Petitioner was guilty of killing his own child, but rather in response to defense counsel's question asking if the jurors would consider rendering a verdict solely because they wanted to end the trial and "go home." (*Id.* at 295–97).  Thus, the postconviction court's conclusion that Juror #11's "Casey Anthony" comment failed to show actual bias was not unreasonable.

The state court's determination that Petitioner failed to show Juror #12 was actually biased against Petitioner was also not unreasonable.  Petitioner contends that Juror #12 "questioned his own ability to be impartial" (Doc. 1 at 28, ¶ 117) when he stated that he was concerned about whether he could be fair and impartial to Petitioner, who was charged with killing his own child.  But both the state trial court and the state postconviction court agreed that Juror #12 was stating what many of the potential jurors likely believed—that it may be challenging to be impartial in a case involving the death of a child at the hands of a parent.  (Doc. 6-2 at 284, 941).  And the courts also found that, despite Juror #12's concerns, he

---

[6] In the Casey Anthony case, the jury reached a verdict after less than eleven hours of deliberations following a six-week trial. NBC News, *Casey Anthony found not guilty of murdering daughter* (July 5, 2011), available at https://www.nbcnews.com/id/wbna43636855 (last visited on Mar. 12, 2026).

indicated that he could be fair and impartial. (*Id.*). The record supports the state courts' findings. Juror #12 stated that although it would be "very emotional" and "not an easy thing to do," he believed he could be fair and impartial. (*Id.* at 931). His initial hesitancy about his ability to be fair and impartial, considering the facts of the case, is insufficient to establish that he was actually biased against Petitioner. S*ee Irvin v. Dowd*, 366 U.S. 717, 723 (1961) ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.").

Because Petitioner failed to demonstrate that Juror #11 and Juror #12 held biased or prejudiced beliefs that would have prevented them from returning a verdict based on the law and evidence, trial counsel was not ineffective. Thus, the state postconviction court did not unreasonably deny the claim.

### B. Claim II(B)

Petitioner asserts that trial counsel was ineffective for failing to move to suppress his statements to law enforcement after he invoked his right to remain silent. Petitioner spoke to law enforcement four separate times (December 13, 2012, with Officer Jeffery Kokinda at the hospital; December 13, 2012, with Detective Kim Northfield at the hospital; December 15, 2012, with Detective

Northfield at the hospital; and December 19, 2012, with Detective Northfield at the police station).  (Doc. 6-2 at 1064, 1074, 1148, 1150–51, 1172, 1175, 1204, 1206).  In his petition, Petitioner challenges only his statements during the third and fourth interviews (Detective Northfield's second and third interviews).  (Doc. 1 at 29–34).

Petitioner raised similar arguments in Claim I of his Rule 3.850 Motion. (Doc. 6-2 at 316–23).  The postconviction court denied the claim, noting that the allegations were insufficient because Petitioner failed to identify the specific statements that should have been suppressed and to show how their suppression would have changed the outcome of the trial.  (*Id.* at 529–34).   The postconviction court also concluded that there was no reasonable probability that a motion to suppress, on the grounds Petitioner presented, would have been granted.  (*Id.* at 530-34).  The court explained:

> Defendant claims trial counsel was ineffective for failing to move to suppress Defendant's incriminating statements to law enforcement. He argues that the statements from his first interview should have been suppressed because he was not advised of his *Miranda* rights, and the statements from his second and third interviews should have been suppressed because officers ignored invocations of his right to silence. This claim was previously stricken because Defendant failed to identify the particular statements that should have been suppressed, and he failed to allege or demonstrate how suppression of those particular statements would have changed the outcome of the trial.

> The present motion suffers the same deficiencies. Defendant does not identify the particular statements that should have been suppressed in relation to each of three separate grounds for suppression now argued. The only identification of specific statements is made by reference to the prosecutor's recounting of certain statements Defendant made at various points across all three

interviews. Neither that summation of the evidence nor Defendant's motion specify where each of these separate statements were made in relation to the grounds for suppression argued in this claim. Moreover, Defendant's allegation that suppression of "the statements" would have changed the outcome of the trial treats all of Defendant's statements as a single, amalgamated unit, frustrating any attempt to analyze the prejudice arising from each of the three distinct suppression claims.

Notwithstanding these deficiencies, the Court has reviewed the record and finds that there is no reasonable probability that a motion to suppress statements from the first or second interview on the grounds now argued would have been granted.  The first interview occurred on December 13, 2012, at All Children's Hospital. After observing the victim's injuries, Officer Jeffrey Kokinda spoke to Defendant and the other family members at the hospital while accompanied by two members of the Child Protection Team and another backup officer. The interview with Defendant occurred at a large conference room table in the hospital. The interview was not recorded. Officer Kokinda testified at trial regarding the substance of that interview.

Defendant claims that his statements during this first interview should have been suppressed because he was not advised of his *Miranda* rights. "Miranda warnings apply only to in-custody interrogations," and "whether a person was in custody for purposes of *Miranda* depends on how a reasonable person in the suspect's situation would perceive his circumstances," *Ross v. State*, 45 So 3d 403, 414-15 (Fla 2010) (internal quotations omitted). This inquiry is guided by the so-called *Ramirez* factors (1) the manner in which police summon the suspect for questioning, (2) the purpose, place, and manner of the interrogation, (3) the extent to which the suspect is confronted with evidence of his or her guilt, and (4) whether the suspect is informed that he or she is free to leave the place of questioning. *Id*. at 415; *Ramirez v State*, 739 So 2d 568, 574 (Fla. 1999).

Defendant raises three arguments in support of his claim that this was a custodial interview. He first argues he did not feel free to leave the hospital because he was still awaiting a medical prognosis for M. S. While Defendant may have felt compelled to remain at the hospital on account of his daughter, that has no bearing on whether a reasonable person would have felt free to leave the conference room where the interview occurred or otherwise end the encounter with law

- 21 -

enforcement. Defendant also argues that he felt compelled to remain because leaving the interview would have been seen as incriminating. This argument admits Defendant felt that he was free to leave the interview without being stopped, whether or not it would be seen as incriminating. The Court finds no merit in either of these arguments.

Defendant also argues that the interview became custodial when he began making incriminating statements about binding, restraining, and "hogtying" M. S. "What begins as a noncustodial interrogation may be transformed into a custodial interrogation by a confession that the suspect utters during the interrogation." *State v Pitts*, 936 So 2d 1111, 1134 (Fla 2d DCA 2006). This principle is typically applied where, in the course of an otherwise noncustodial interrogation, a defendant directly confesses to a criminal act. *See id.* (defendant confessed to holding a gun on the victims), *Cushman v State*, 228 So 3d 607, 618 (Fla 2d DCA 2017) (defendant confessed to touching and rubbing the minor victim's butt with his hand).

Defendant admitted to binding and restraining the [sic] M. S. on several prior occasions due to her behavioral difficulties and propensity for self-harm, but he stated that Misty restrained the victim on the night of her hospitalization, the incident law enforcement was investigating. According to Defendant, Misty was responsible for checking on the victim that night while Defendant was in another room playing games with his eight-month-old child. Misty checked on the victim at least once and found that everything was okay, but she later entered Defendant's room to report that the victim was not breathing. Defendant's statements during this interview, while incriminating, did not rise to the level of a direct confession to criminal conduct that would convert the interview into a custodial interrogation. On this record, the Court finds no reasonable probability that a motion to suppress the statements on this basis would have been successful.

Defendant argues that his statements during the second interview were subject to suppression because "during the second interrogation, [he] invoked his Fifth Amendment right to remain silent," but law enforcement continued questioning him. The second interview occurred on December 15, 2018, at All Children's Hospital and was audio recorded. Detective Kim Northfield conducted the interview while accompanied by Detective Stephanie Graham. Defendant specifically relies on the following exchange as his

invocation of his right to remain silent.

Q       Okay. So where did the duct tape come from between the hour, hour and a half that you were watching (inaudible) did you say did you have to restrain her what was going on?

A       I just had a - I would like to not speak anymore.

Q       Okay. That's up to you.

A       Unless I can speak somewhat off the record.

Q       I'm not sure what that means. Yeah?

A       It's hard for me to say.

Q       Well, that's - if that's a particular point, so you don't want to address (inaudible) you don't have to talk to us. (Inaudible) you're welcome to walk out at any (inaudible). I would really like to sit and talk to you. Yeah. I mean if you want to talk to us you just don't want to talk about that (inaudible)?

Questioning continued after this exchange.

Even assuming, without deciding, that Defendant was in custody during this interview, the cited statements do not reflect an unequivocal invocation of the right to silence. Although law enforcement must honor a suspect's invocation of the right to remain silent during a custodial interrogation, further questioning is permitted if the suspect's invocation of the right is ambiguous or equivocal. *Alvarez v State*, 15 So 3d 738, 743 (Fla 4th DCA 2009). The test is whether a reasonable officer under the circumstances would understand that the suspect has invoked his right to end questioning. *Deviney v State*, 112 So 3d 57, 74 (Fla 2013). An unequivocal invocation includes not just a suspect's words, but also his conduct. *Id*. Defendant's statement that he did not wish to speak unless he could speak "somewhat off the record" was clearly equivocal and ambiguous. At minimum, it reflected some desire to continue speaking with law enforcement in some respect. Immediately after the statement, the detective made it clear that Defendant was free to stop talking or end the interview. Defendant's further engagement with the officer after

- 23 -

this statement only reinforces its equivocal nature. On this record, the Court finds no reasonable probability that a motion to suppress these statements would have been successful.

Finally, Defendant argues that his statements during the third interview should have been suppressed because questioning continued after he invoked his right to remain silent. As noted above, Defendant's claim involves suppression of three separate sets of statements on three different grounds, and his singular allegation that suppression of "the statements" would have changed the outcome of the trial is an insufficient claim of prejudice as it relates to each of the individual claims of suppression and the separate sets of statements at issue. As this claim relates to the first two interviews, the Court did not need to reach the potential impact of particular statements in light of its finding that they would not have been suppressed.

The insufficient pleading of this claim is a greater problem in relation to the third interview. Defendant cites a mid-trial bench conference where the State informed the Court that Defendant invoked his right to silence approximately halfway through the third interview. Even assuming that a motion to suppress the statements made after this invocation would have been successful, Defendant wholly fails to specifically identify where in the third interview this invocation occurred, what statements were made after the invocation, or how suppression of those particular statements would have changed the outcome of the trial in light of the statements given prior to the invocation, the statements given throughout the first and second interviews, or the other evidence against him. In sum, his allegation of prejudice regarding his statements to law enforcement as a whole is insufficient to establish prejudice in relation to a specific motion to suppress unspecified statements made after the invocation of his right to remain silent at an unspecified point during the third interview.

Having previously afforded an opportunity to amend this claim, and finding that it remains insufficient, the Court now denies the claim with prejudice as it relates to the third interview. *See* Fla R Crim P 3.850(f).

(*Id.* at 529–34) (footnotes omitted).  The state appellate court affirmed the denial of

the Rule 3.850 without a written opinion.  (*Id.* at 563).

- 24 -

Based upon a review of the record, the Court concludes that the state courts' rejection of this claim was neither an unreasonable application of *Strickland* nor based upon an unreasonable determination of the facts. Petitioner first contends that after the third and fourth interrogations started, he asserted his right to remain silent. "When a person undergoing a custodial interrogation states that he wishes to remain silent the questioning must end . . . ." *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). However, a suspect's invocation of his rights must be unequivocal. *United States v. Ochoa*, 941 F.3d 1074, 1098 (2019) (citing *Davis v. United States*, 512 U.S. 452, 461–62 (1994)).

The state postconviction court found that Petitioner did not unequivocally assert his right to remain silent and terminate the third interrogation (Detective Northfield's December 15, 2012 recorded interview). (Doc. 6-2 at 533). This factual finding is entitled to deference, and Petitioner has not presented clear and convincing evidence to the contrary. Petitioner's statement that he "would like to not speak anymore," almost immediately followed by his statement "[u]nless I can speak somewhat off the record" (Doc. 6-2 at 1185), was equivocal and ambiguous. A reasonable police officer in that circumstance would not understand Petitioner's statement to be a request to cease questioning, especially where Petitioner continued to answer questions after Detective Northfield made it clear that Petitioner was free to stop talking and leave. *See Ochoa*, 941 F.3d at 1098 ("[A]

suspect must articulate his desire with sufficient clarity that a 'reasonable police officer in the circumstances would understand the statement to be a request' . . . to cease further questioning." (quoting *Davis*, 512 U.S at 459)).  Petitioner has failed to make a showing that he unequivocally requested to remain silent during the interview on December 15, 2012 (the third interview).  Consequently, trial counsel cannot be deemed deficient for failing to file a motion to suppress Petitioner's statements during that interview.

Finally, the state postconviction court denied relief on Petitioner's claim that he invoked his right to remain silent during the fourth interview because his allegation of prejudice was insufficiently pleaded.  (Doc. 6-2 at 533–34).  Petitioner had alleged that before the fourth interview—which was recorded—was played for the jury, the prosecutor informed the court that Petitioner had invoked his right to remain silent "halfway through the video recording[.]"  (*Id.* at 311).  However, Petitioner never identified exactly when he ostensibly invoked his right to remain silent during the fourth interview.  (*Id.* at 316–23).  Nor did he identify the statements he made after invoking that right.  (*Id.*).  He also fails to identify in his federal habeas petition when he invoked his right to silence and which statements were made after doing so.  (Doc. 1).

Vague, conclusory, speculative, or unsupported claims cannot support an ineffective assistance of counsel claim. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991).  And it's not this Court's duty to comb the state-court record to attempt

- 26 -

to identify the facts that support Petitioner's claim. *See, e.g., Chandler v. Volunteers of Am., N. Alabama, Inc.*, 598 F. App'x 655, 663 (11th Cir. 2015) (noting that "counsel still seems to be under the misimpression that it is the court's job, not counsel's, initially to comb through the record, identify the facts supporting the plaintiff's legal position, and apply them to the law-all without any guidance from counsel."); Rule 2(c)(2), Rules Governing Habeas Corpus Cases Under Section 2254; *Mayle v. Felix*, 545 U.S. 644, 654 (2005) (noting that Rule 2(c) is demanding and provides that a petitioner must specify all grounds for relief and the facts supporting each ground); *Broughton v. Crews*, 2016 WL 4628051, at *37 (S.D. Fla. Jan. 28, 2016), *report and recommendation adopted*, 2016 WL 4625616 (S.D. Fla. Sept. 6, 2016) ("The petitioner is represented by counsel in these [habeas corpus] proceedings and it is not the role of the Court to find support for the petitioner's claim of ineffective assistance of appellate counsel . . . .").

Petitioner fails to show that the state postconviction court's decision that this claim was insufficiently pleaded was objectively unreasonable, contrary to Supreme Court law, or based on an unreasonable application of the facts. And even if adequately pleaded, his claim would still fail because he does not show prejudice. Considering Petitioner's prior statements during his previous interviews, and the other inculpatory evidence, including Petitioner's stepson, Jarrett Eastman's, eyewitness testimony, any error in admitting the part of the fourth interview after Petitioner invoked his right to remain silent was harmless. (Doc. 6-2 at 1421-66).

- 27 -

*See Brecht v. Abrahamson*, 507 U.S. 619 (1993) (constitutional error will be considered harmless in a habeas proceeding unless the error had substantial and injurious effect or influence on the verdict or sentence); *United States v. Street*, 472 F.3d 1298, 1314–15 (11th Cir. 2006) (explaining that the harmless error rule applies to evidence admitted in violation of *Miranda*).  Therefore, no habeas relief is warranted on Claim II.

## IV. Conclusion

Based on the foregoing, Petitioner is not entitled to habeas relief.

Accordingly, it is **ORDERED** that:

1. The 28 U.S.C. § 2254 petition (Doc. 1) filed by Petitioner is **DENIED**.

2. The Clerk is **DIRECTED** to enter judgment in favor of Respondent and against Petitioner, deny any pending motions as moot, terminate any deadlines, and close this case.

### Certificate of Appealability[7]

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court or circuit justice or judge must first issue a certificate of appealability (COA).  "A [COA] may issue...only if the applicant has made a substantial showing

---

[7] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented [are] adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

Upon consideration of the record, the Court declines to issue a COA. Because Petitioner is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**DONE and ORDERED** in Tampa, Florida, on March 13, 2026.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

- 29 -